UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,⠀⠀⠀⠀)⠀⠀15-CR-171-1
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
KEONNA THOMAS,⠀⠀⠀⠀⠀⠀⠀⠀)
a/k/a FATAYAT AL KHILAFAH,⠀⠀)
a/k/a YOUNGLIONESS,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Philadelphia, PA
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀July 22, 2016
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀)⠀⠀2:05 p.m.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:⠀⠀⠀⠀⠀JENNIFER WILLIAMS, ESQUIRE
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ASSISTANT UNITED STATES ATTORNEY
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀UNITED STATES ATTORNEY'S OFFICE
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀615 Chestnut Street
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Suite 1250
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Philadelphia, PA  19106


For the Defendant:⠀⠀⠀⠀⠀ELIZABETH TOPLIN, ESQUIRE
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀KATHLEEN GAUGHAN, ESQUIRE
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ANDREW JOHN DALACK, ESQUIRE
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀FEDERAL DEFENDERS ASSOCIATION
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀The Curtis Center
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Suite 540 West
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Philadelphia, PA  19106


Audio Operator:⠀⠀⠀⠀⠀⠀JANICE LUTZ


Transcribed by:⠀⠀⠀⠀⠀⠀DIANA DOMAN TRANSCRIBING, LLC
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀P.O. Box 129
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Gibbsboro, New Jersey  08026
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Office:  (856) 435-7172
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Fax:⠀⠀⠀(856) 435-7124
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                               <u>I N D E X</u>

2     <u>ARGUMENT</u>:                                    <u>PAGE</u>

3     Re:  Schedule for expert report

4       By Ms. Williams                               3

5       By Ms. Toplin                                 5

6     Re:  Notice and discovery of Government

7     Surveillance used in investigation

8       By Mr. Dalack                              7, 38

9       By Ms. Williams                           27, 34

10    <u>DECISION OF THE COURT</u>:                        <u>PAGE</u>

11      By Judge Baylson

12    Re:  Schedule for expert report                 6

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (The following was heard in open court at 2:05 p.m.)

 2                  THE COURT:  Okay.  We're here for a pretrial hearing

 3       in the United States versus Keonna Thomas.

 4                  Present is Jennifer Williams for the United States.

 5                  For the defendant we have Kathleen Gaughan.  We have

 6       Andrew Dalack and Elizabeth Toplin.

 7                  And the -- there are two issues that I anticipate

 8       having argument on.

 9                  The first is the defendant's motion to compel notice

10       and discovery of surveillance used in the Government's

11       investigation.

12                  And the second is a recently filed motion for --

13       that the defendant filed for reconsideration -- consideration

14       of changing the schedule regarding when the Government's

15       expert report will be served so that the defendant may have

16       time to file a motion in limine.

17                  Okay.  Can we talk about the second one first?  Ms.

18       Williams, have you had a chance to consider this?

19                  MS. WILLIAMS:  I have, Your Honor.

20                  THE COURT:  Or discuss it with counsel?  Yes.

21                  MS. WILLIAMS:  I've not actually discussed it with

22       defense counsel, but I have had a chance to consider it.

23                  The Government ended up having to identify a new

24       expert with the change of trial date because the original

25       expert we had hoped to retain was not available.  We have

1    found a new expert.

2              I understand the defendant's request and I'm -- I'm

3    not opposing the concept of changing the dates, but I do need

4    sufficient time to get the expert up to speed and get his

5    information.

6              I have a suggestion.  My suggestion, first of all,

7    is I could, sooner rather than later, provide notice to the

8    defense of the name and CV of the expert.  That I can provide

9    soon.

10             THE COURT:  Right.

11             MS. WILLIAMS:  And then the full expert disclosure,

12   the summary as laid out in the schedule -- the scheduling

13   order, what if we move that date up a bit and then we move the

14   motion in limine date back a bit which would still give the

15   Court sufficient time to --

16             THE COURT:  All right.  Well, what dates are you

17   suggesting?

18             MS. WILLIAMS:  This is my suggestion.

19             Expert disclosures due September 8th.

20             Motions in limine due September 22nd.

21             With responses due October 6th.

22             THE COURT:  October 5th?

23             MS. WILLIAMS:  6th.

24             THE COURT:  6th?

25             MS. WILLIAMS:  Which is two weeks.  And I can --

1              THE COURT:  Well, that's --

2              MS. WILLIAMS:  -- agree --

3              THE COURT:  -- just a week before the trial.

4              MS. WILLIAMS:  That's correct.  And I would agree to

5    turn over the expert's name and curriculum vitae perhaps a

6    month earlier than the expert disclosure date, August 8th.

7              THE COURT:  How does that sound, Ms. Toplin?  Do you

8    have any --

9              MS. TOPLIN:  Well, Your Honor, my concern, the name

10   and CV are -- are helpful, but, obviously, the more important

11   information is --

12             THE COURT:  Well, I mean, the reports -- but this

13   still gives you two weeks after you get the report to file any

14   motion.

15             MS. TOPLIN:  Yes, Your Honor.  It just gives us a

16   week prior to trial to --

17             THE COURT:  Well --

18             MS. TOPLIN:  -- resolve the motions --

19             THE COURT:  -- the person who is --

20             MS. TOPLIN:  -- in that --

21             THE COURT:  -- affected the most is me, candidly.

22             MS. TOPLIN:  Understood, though --

23             THE COURT:  But I can --

24             MS. TOPLIN:  -- though trial prep is, obviously --

25             THE COURT:  I mean, I'll deal with that.  I mean,

 1    I'll start reading these briefs ahead of time.

 2              MS. TOPLIN:  That's fine, Your Honor.

 3              THE COURT:  All right.  Well, look, that sounds

 4    reasonable to me.  Let's -- let's work with that.

 5              Do you have a date for when you can provide the name

 6    and CV?

 7              MS. WILLIAMS:  I suggest August 8th which is a month

 8    before the report is due.

 9              THE COURT:  A month.  So that'll be August 8th.

10    Okay.

11              MS. WILLIAMS:  August 8th for the disclosure of the

12    CV.  September 8th for the complete expert disclosures.

13              THE COURT:  Okay.  And then the 22nd for the

14    response and the reply brief by the 6th.  Okay.

15              MS. WILLIAMS:  The 22nd for motions in limine.

16              THE COURT:  Motion in limine.  Right.

17              MS. WILLIAMS:  Yes.

18              THE COURT:  And then the response October 6th.

19              MS. WILLIAMS:  Yes.

20              THE COURT:  Okay.  All right.  Very good.  Okay.

21    Thank you.

22              Okay.  We're now coming to the defendant's motion

23    that was filed here.  And I previously signed an order that

24    this would be filed under seal along with the Government's --

25    well, not the motion, but the Government's responses would be

1      filed under seal, so I'll grant that.

2                 And there's one other issue we can discuss.  I have

3      a letter here, I think it's the second letter, from Austin

4      Nolen.  Is he here?  Not here.  All right.  This is a

5      gentleman who sent me letters before about public access.  We

6      can come back to that later.

7                 Okay.  I understand, Mr. Dalack, is that how you

8      pronounce your name, that you would like to make the argument

9      here, is that correct?

10                MR. DALACK:  Yes, Your Honor.

11                THE COURT:  Okay.  Happy to hear you.

12                MR. DALACK:  Great.  Where would you like me to

13     argue from?

14                THE COURT:  Any place you like.

15                MR. DALACK:  Okay.

16                THE COURT:  Just keep your voice up.

17                MR. DALACK:  All right.  No problem.  I can do that.

18                THE COURT:  Do you want to come up to the podium?

19                MR. DALACK:  Sure, why not.

20                THE COURT:  All right.

21                (Pause)

22                THE COURT:  Just let me know, because I have another

23     proceeding at 3:00, how much time would you like.

24                MR. DALACK:  Seven to eight minutes.

25                THE COURT:  Okay.  Fine.

1           MR. DALACK:  Good afternoon, Your Honor.  May it

2    please the Court, my name is Andrew Dalack on behalf of the

3    defendant, Ms. Keonna Thomas.

4           Our argument, Your Honor, is very straightforward

5    and simple.  We don't believe that we're asking for anything

6    that any other defendant is entitled to in any other criminal

7    prosecution, that is notice and discovery of all of the

8    searches and seizures that the Government actually used in

9    this case.

10          Now, specifically we have addressed our motion for

11   notice and discovery of all of the classified surveillance

12   programs, again, that the Government actually employed in this

13   case because that information is critical, first, to our

14   ability to test through an adversarial proceeding the

15   lawfulness of such surveillance.

16          And then, again, to test through an adversarial

17   proceeding in the form of a suppression motion whether or not

18   any evidence unlawfully obtained through those surveillance

19   techniques tainted the Government's evidence or the evidence

20   that the Government actually intends to introduce at trial.

21          Now, in its response the Government tries to present

22   its position as the rule rather than the exception.  But that

23   is flipping Ms. Thomas' due process rights on their head

24   because the rule is actually that the Government must provide

25   disclosure, notice and discovery of information material to

1    the defense under Rule 16 of the Federal Rules of Criminal

2    Procedure.  This is also embedded in Ms. Thomas' rights under

3    the Fourth Amendment and also her due process rights under the

4    Fifth Amendment.

5         The reason that the Government claims that it's not

6    obligated to give us this information in this case seems to be

7    that they've already given us all of the unclassified

8    information to which we are entitled and that there is a whole

9    cache of information that is classified to which we are not

10   entitled.  But Ms. Thomas' discovery rights do not turn on

11   this distinction between classified and unclassified evidence.

12        Indeed, the Confidential Information Protective Act,

13   the order that you signed at the very beginning of this case

14   allowing the Government to provide you with a whole, again,

15   cache of classified information, does not constrict or narrow

16   the Government's discovery obligations.

17        If the material -- if the evidence is material to

18   Ms. Thomas' defense, and indeed this material -- this evidence

19   is material to Ms. Thomas' right to seek suppression under the

20   exclusionary rule, then the Government must provide notice and

21   discovery.

22        Now, we are certainly capable and interested in

23   entering into any sort of additional protective order that the

24   Government, with our negotiations with the Court, deems fit to

25   make sure that this information is not improperly divulged,

1    but I really want to stress, Your Honor, that we're not on a

2    fishing expedition.

3              Without information concerning all of the searches

4    and seizures that the Government undertook in this case there

5    really is no way for Ms. Thomas to intelligently challenge the

6    lawfulness or the admissibility of any of the evidence that

7    the Government does intend to introduce.

8              And this is especially important in this case

9    because the evidence that the Government intends to introduce

10   at trial comes down to Ms. Thomas' private electronic

11   communications with the three alleged co-conspirators and

12   surveillance concerning a whole host of her activities,

13   including her financial records, travel records and Internet

14   search history.

15             One of the biggest fears for us here is that all of

16   the evidence that the Government intends to introduce at

17   trial, again, these communications and these records about her

18   activities, could have all been originally obtained under a

19   whole host of classified surveillance techniques that the

20   Government has and enjoys at its disposal when investigating

21   national security or international terrorism crimes.

22             The problem, Your Honor, in a nutshell, is this.

23   The Government wants to have it both ways.  It wants to be

24   able to on the front end, at the very beginning of an

25   investigation, be able to utilize all of the tools at its

 1      disposal.  Again, these tools include Executive Order 12333,

 2      the FISA Section 702 under the Foreign Intelligence

 3      Surveillance Act, FISA Section 703 to 705, National Security

 4      Letters, Section 215 of the Patriot Act.

 5              The Government wants to be able to essentially not

 6      have this wall between foreign intelligence gathering and then

 7      gathering of evidence in the course of a criminal prosecution.

 8              But then on the back end, to the detriment of the

 9      defendant, Ms. Thomas, the Government wants to resurrect this

10      arbitrary wall between evidence gleaned for strictly foreign

11      intelligence purposes versus evidence gleaned for the purposes

12      of a criminal prosecution.

13              The Government is not entitled to make arbitrary

14      one-sided, self-serving determinations about whether its

15      evidence is admissible.  Indeed, there is no way for Ms.

16      Thomas to test whether any of the evidence that the Government

17      intends to introduce was generated from unlawful surveillance

18      techniques.

19              This is especially critical here because all of the

20      techniques that we outlined in our motion have been relatively

21      untested by Courts in criminal cases.

22              And indeed when the FISA Amendments Act was enacted

23      in 2008 despite the strict statutory requirement that

24      defendants receive notice of Section 702 surveillance the

25      Government failed to provide such notice for five years.  It

1    wasn't until 2013 until a defendant first received notice.

2            And that was in direct result of a controversy that

3    took place after the Solicitor General manifested to the

4    Supreme Court in Amnesty International versus Clapper that

5    defendants would indeed be receiving this notice and that was

6    contrary to the practice that lawyers in the National Security

7    Division had been, you know, participating in.  That was

8    contrary to the practice of these National Security Division

9    attorneys.

10           If I can make a brief analogy, Your Honor?

11           THE COURT:  Well, let me just ask you a question --

12           MR. DALACK:  Sure.

13           THE COURT:  -- to make sure I understand.  It's --

14   it's no new news to anybody who deals in criminal cases that

15   law enforcement uses informants.  Okay.

16           MR. DALACK:  Yes, Your Honor.

17           THE COURT:  In drug cases, in all kinds of cases.

18   Okay.  There are people who are ready, willing and anxious in

19   some cases to provide information to law enforcement.  Okay.

20           Now, the fairly settled law here is that the

21   Government is not obliged to disclose the identify to an

22   informant.

23           MR. DALACK:  Yes, Your Honor.

24           THE COURT:  Okay.

25           MR. DALACK:  I understand that.

1              THE COURT:  With some exceptions, but that -- I

2      think that's a general rule.

3              Now, I have no idea in this case if the Government

4      used informants.  Okay.  But let's assume they did.

5              MR. DALACK:  Okay.

6              THE COURT:  Are you saying you're entitled to know

7      the identity of the informant?

8              MR. DALACK:  Well, no, Your Honor, but, again, we

9      have --

10             THE COURT:  No.  Your answer is no to that?

11             MR. DALACK:  Not necessarily.  Not without having

12     been first -- having a chance to actually test the informant's

13     credibility as the Supreme Court has delineated.

14             THE COURT:  Well, I'm not sure the Supreme Court has

15     opened the door to a defendant testing the credibility of an

16     informant who merely provides information.  I'm not talking

17     about somebody who is testifying.

18             MR. DALACK:  I understand.

19             THE COURT:  Purely providing information.

20             MR. DALACK:  That's distinct from this case because

21     we've got no information whatsoever for the Government

22     suggesting --

23             THE COURT:  Well --

24             MR. DALACK:  -- that informants were used.

25             THE COURT:  But maybe there was an informant and

1   maybe that's what they don't want to tell you.  They don't

2   want to -- I mean, your motion is so broad that the way I read

3   it it includes informants, including somebody who may have

4   anonymously called up the FBI or the U.S. Attorney's Office

5   and said, you know, I don't want to reveal any name, but I

6   know da-da-da-da-da, and I know Ms. Thomas.  And I'm telling

7   you that Ms. Thomas and da-da-da-da did da-da-da-da.  Okay.

8            MR. DALACK:  I understand.

9            THE COURT:  Now, that's just a hypothetical.  I have

10  no idea if there is any information, but the way your motion

11  is phrased that's one of the things you're -- you're calling

12  for.

13           MR. DALACK:  I actually would challenge that

14  characterization, Your Honor, because the way that the motion

15  is phrased is very specific and it sort of contradicts the

16  idea that this is any sort of a fishing expedition.  We're

17  asking for the specific surveillance techniques that were

18  used.

19           THE COURT:  So you're telling me --

20           MR. DALACK:  Specifically any searches and seizures.

21           THE COURT:  -- your motion is limited to

22  surveillance?

23           MR. DALACK:  That's how we have written it right now

24  is that we're looking for any surveillance techniques that the

25  Government used in order to effectuate searches and seizures

1  that implicated Ms. Thomas' privacy interest.

2           And we're arguing that when the Government states

3  that it's not intending to introduce any evidence derived or

4  obtained from these classified surveillance procedures that

5  that's not a decision that the Court can credit because it is

6  not the -- it's not the role of the Executive Branch to make

7  determinations about the admissibility --

8           THE COURT:  All right.  Well --

9           MR. DALACK:  -- of its evidence.

10          THE COURT:  There were searches and seizures here,

11 correct?

12          MR. DALACK:  Yes, Your Honor.

13          THE COURT:  All right.  And you have the affidavits

14 that were submitted in support of the search warrant?

15          MR. DALACK:  We have the affidavit submitted in

16 support of the search warrants, the Rule 41 search warrants

17 for her home, Facebook account and Gmail account.  Yes, Your

18 Honor.

19          THE COURT:  Okay.  But you want to know if there are

20 others, is that right?

21          MR. DALACK:  Well, this is -- the problem is that we

22 have to confront the realistic possibility, strong possibility

23 in this case, given the Government's admission that there is a

24 whole cache of classified information that we have not been

25 privy to at this -- you know, up until this point --

1           THE COURT:  Right.

2           MR. DALACK:  -- that the Government used parallel

3    techniques to originally obtain this evidence and then on the

4    back end used techniques that are less controversial to re-

5    obtain that same evidence.  So if I may, Your Honor?

6           THE COURT:  Yes.

7           MR. DALACK:  In the context of stingrays, for

8    example.  Are you familiar with the Government's use of

9    stingrays in criminal prosecutions?

10           THE COURT:  I've heard of it.  Yes.

11           MR. DALACK:  Okay.  So basically a stingray is a

12   device that allows the Government to pinpoint an individual's

13   location based on their cell phone signal.  Okay.

14           THE COURT:  Yes.

15           MR. DALACK:  For years the Government was using

16   stingray surveillance.  A novel, untested, technologically

17   sophisticated technique to gather evidence about defendants in

18   criminal prosecutions.  And for years the Government was not

19   disclosing to defendants whether or not these stingrays were

20   actually used.

21           Well, recently the Government has re-evaluated its

22   policies concerning stingray surveillance as a result of

23   public disclosures sort of criticizing and chastising the

24   Government for using these techniques without disclosing them.

25           And in response Court's have found that those

1    stingray procedures without a warrant -- that the use of

2    stingray surveillance without a warrant is unlawful.

3              And this is exactly the critical part here for us is

4    that if we were to be able to test --

5              THE COURT:  Well, let me just interrupt you again.

6    I'm sorry.

7              MR. DALACK:  Sure.

8              THE COURT:  Let's go back to the search warrants.

9              MR. DALACK:  Okay.

10             THE COURT:  Because you -- you agree you have the

11   affidavits.

12             MR. DALACK:  Yes, Your Honor.

13             THE COURT:  Now, are -- do any of the affidavits

14   discuss surveillance as being part of probable cause?

15             MR. DALACK:  Yes.

16             THE COURT:  Well, then don't you have that?

17             MR. DALACK:  No, because we actually --

18             THE COURT:  Why not?

19             MR. DALACK:  In one of the probable cause affidavits

20   for the search warrant for her Facebook account the Government

21   makes express reference -- or references explicitly the

22   exercise or the effectuation of other lawful search warrants

23   for acquiring her communications.  And they use her

24   communications that they acquired through so-called other

25   lawful search warrants.

1              THE COURT:  Well, that could be under FISA, right,

2     F-I-S-A?

3              MR. DALACK:  It certainly could be under FISA.

4              THE COURT:  All right.  But --

5              MR. DALACK:  It could be under Executive Order

6     12333.

7              THE COURT:  Right.

8              MR. DALACK:  It could be under any of those --

9              THE COURT:  But those are --

10             MR. DALACK:  -- classified provisions.

11             THE COURT:  Those are what you -- you agree are

12    classified methods of investigation?

13             MR. DALACK:  Certainly.

14             THE COURT:  Correct.

15             MR. DALACK:  But just because they're classified

16    doesn't mitigate or, you know, denigrate our rights in notice

17    and discovery.  Again, we'll -- we're willing to take --

18             THE COURT:  Well, I didn't -- you know, your motion

19    is very well written, but I didn't see any case citation

20    supporting the arguments.  Now --

21             MR. DALACK:  Well, I -- again, I would contest that

22    because I would like to point the Court's attention to

23    Alderman versus the United States which is a Supreme Court

24    case that I believe is squarely on point here and that

25    emphasizes the critical nature of adversary proceedings when

1    it comes to testing.

2              THE COURT:  All right.  Did you cite that in your

3    memo?

4              MR. DALACK:  Yes, I did, Your Honor.

5              THE COURT:  Now --

6              MR. DALACK:  And I actually have a copy.

7              THE COURT:  I didn't mean there were no cases, but I

8    didn't find anything that was directly on point.  Where is

9    Alderman?

10             MR. DALACK:  I have a copy for you if you'd like.

11             THE COURT:  All right.

12             MR. DALACK:  But Alderman --

13             THE COURT:  What page is it on?

14             MR. DALACK:  I cited it several times, but when I

15   initially cited -- cited it, Your Honor, in the brief I did so

16   on page -- it's first cited on page three and then it's

17   discussed more extensively on pages --

18             THE COURT:  All right.

19             MR. DALACK:  Excuse me for a moment.

20             (Pause)

21             MR. DALACK:  26 through 28.  The Fourth and Fifth

22   Amendments require notice and discovery of secret

23   surveillance.

24             THE COURT:  Right.  Okay.

25             MR. DALACK:  I actually have a copy of Alderman here

 1    that I'd like to --

 2              THE COURT:  Sure.

 3              MR. DALACK:  -- present to the Court.  May I

 4    approach?

 5              THE COURT:  Yes, sure.

 6              (Pause)

 7              THE COURT:  Okay.  All right.  You're pointing out

 8    to headnote 116 at page 182 -- headnote 16 at page 182.

 9              MR. DALACK:  Yes, Your Honor.

10              THE COURT:  Starting, "Although this may appear".

11              MR. DALACK:  Right.  So to give a brief synopsis in

12    this case the Government used surreptitious surveillance to

13    overhear the petitioner's conversations inside of a home and

14    it did so without a warrant.

15              And the Government tried to claim that it was not

16    required to present or provide the defendants with notice and

17    discovery of these surreptitious surveillance tactics and the

18    evidence gleaned therefrom, and I quote, "That the Government

19    claimed that the evidence was not relevant to any

20    prosecution."

21              That's effectively what the Government is claiming

22    here that any information gleaned from classified surveillance

23    procedures is not relevant to this prosecution because the

24    Government does not intend to offer any evidence derived or

25    obtained therefrom at trial.

1          THE COURT:  Right.

2          MR. DALACK:  But that is not a determination that

3    the Executive Branch is authorized to make with adversary

4    proceedings.

5          And I point here that on headnote 16, page 182, the

6    Government asked the Court, first, if they could allow the

7    Court to view it through an in-camera proceeding.  Okay.

8          THE COURT:  Right.

9          MR. DALACK:  Whether or not any of the information

10   gleaned from these surreptitious surveillance tactics was

11   arguably relevant to the prosecution.

12         And I quote the Supreme Court, "Although this may

13   appear a modest proposal, especially since the standard for

14   disclosure would be arguable relevance, we conclude that

15   surveillance records as to which any petitioner has standing

16   to object should be turned over to him without being screened

17   in-camera by the Trial Judge."  It's very clear.

18         The Supreme Court goes on to talk about the critical

19   nature of adversary proceedings in testing the lawfulness or

20   the admissibility of the Government's evidence especially when

21   it comes to novel, controversial surveillance techniques that

22   have previously been untested in court.

23         THE COURT:  Well, what -- what would be an example

24   in your mind of an unlawful surveillance technique?

25         MR. DALACK:  Well, for example, if the Government

1    acquired any information about Ms. Thomas, communications or

2    otherwise, under Executive Order 12333 we're entitled to know

3    about that because the Government claims that it has no

4    discovery obligations whatsoever under Executive Order 12333.

5    And that Executive order authorizes the Government pretty much

6    to have carte blanche when it comes to acquiring information,

7    content, metadata, as long as that acquisition occurs

8    overseas.

9            Well, Court -- we trust the Court, we want the Court

10   to obtain the position to decide whether or not that violates

11   the reasonableness requirement under the Fourth Amendment.

12   That's a perfect example.

13           Another example is Section 215 in the Patriot Act.

14   For years the Government was interpreting its authorities

15   under Section 215 of the Patriot Act secretly so as to justify

16   the bulk collection of U.S. persons telephone metadata.

17           Finally, when that came to light through public

18   disclosures the Second Circuit had a chance to consider the

19   constitutionality of the Government's interpretation of its

20   authority under Section 215 and it found that the Government's

21   interpretation that it was allowed to collect in bulk

22   Americans telephoning metadata was unconstitutional and was an

23   unconstitutional infringement on their Fourth Amendment

24   rights.

25           This is why our argument is so critical.  Because

 1   without notice and discovery of the actual surveillance

 2   methods that were used there is no way for us to test whether

 3   or not the Government generated any evidence that it seeks to

 4   admit at trial in violation of Ms. Thomas' Fourth Amendment

 5   rights.

 6           THE COURT:  Well, suppose -- once again I'm speaking

 7   hypothetically because I don't know.  Well, suppose the --

 8   whatever the surveillance was was covered by a FISA petition,

 9   F-I-S-A.

10           MR. DALACK:  Okay.

11           THE COURT:  Do you -- do you assert you have a right

12   to that as well?

13           MR. DALACK:  FISA provides an express notice

14   requirement.  And, yes, we would be entitled to that, Your

15   Honor.

16           THE COURT:  All right.

17           MR. DALACK:  Absolutely.

18           THE COURT:  And did you receive any of those or no?

19           MR. DALACK:  We haven't yet, but that's not because

20   it doesn't exist.  That may very well be because the

21   Government is construing its notice obligation so narrowly so

22   as to essentially say evidence is not derived from FISA

23   surveillance so as to trigger notice under the statute if we

24   don't seek to introduce evidence directly obtained from FISA

25   surveillance at trial.

1          And that gives way to our parallel construction

2     argument.  If the original source of the information was a

3     FISA Court order or if it wasn't through a FISA Court order

4     because Section 702 of FISA doesn't even require the FISA --

5     the FISA Court to issue an order, if the Government gleaned

6     any information or any of Ms. Thomas' communications through

7     FISA and then the Government later re-obtained that same

8     information using a Rule 41 search warrant it doesn't change

9     the fact that we are entitled to notice and discovery of the

10    original source of that information so we an test through an

11    adversarial proceeding whether that acquisition tainted the

12    Government's --

13          THE COURT:  All right.  Is this --

14          MR. DALACK:  -- later acquisition.

15          THE COURT:  So this is a fruit of the poisonous tree

16    type of argument?

17          MR. DALACK:  Absolutely.  And it's not a decision

18    that the Government is entitled to make ex parte,

19    independently, in a self-serving matter --

20          THE COURT:  All right.  Okay.  But --

21          MR. DALACK:  -- to the detriment of Ms. Thomas.

22          THE COURT:  Okay.  Now, I -- when I said that you

23    didn't have any citations I -- I mean, you have lots of

24    citations, but I didn't find a case right on point on this

25    issue.

1          MR. DALACK:  And I would say, Your Honor, that if we

2     could keep the facts and our interpretation of the law to

3     ourselves and not disclose them with the Court or with our

4     adversary we'd win every case too just because the Government

5     has not provided the Court an opportunity --

6          THE COURT:  All right.

7          MR. DALACK:  -- to test these issues.

8          THE COURT:  Okay.  My point is that you're not able

9     to show me another District Court Judge that has granted the

10    relief that you're seeking in this case?

11         MR. DALACK:  I -- I do not believe that's correct,

12    Your Honor.

13         THE COURT:  All right.  Well, then tell me --

14         MR. DALACK:  On --

15         THE COURT:  Tell me where I'm wrong.

16         MR. DALACK:  So, for example, we actually cite a

17    number of different authorities for why we are entitled to

18    notice and discovery.

19         THE COURT:  Right.

20         MR. DALACK:  One of them 18, U.S.C., 3504.

21         THE COURT:  Well, I'm talking about a --

22         MR. DALACK:  And that explicitly --

23         THE COURT:  -- decision -- a case.

24         MR. DALACK:  Well, yes, I'm pointing you to that

25    case, Your Honor.

Dalack - Argument                               26

1          THE COURT:  Go ahead.  What page are you on?  I

2     mean, I thought your -- your brief was very done and very well

3     written.

4          MR. DALACK:  I do appreciate that, Your Honor.

5          THE COURT:  I compliment you on that.

6          MR. DALACK:  I hope it's also persuasive.

7          (Pause)

8          MR. DALACK:  On page 33.  If I may point you to note

9     52.

10          THE COURT:  Okay.

11          MR. DALACK:  Specifically in discussing why we are

12    entitled to notice under 18, U.S.C., 3504 which requires the

13    Government to affirm or deny the existence or the use of

14    surreptitious surveillance given a -- a colorable claim or

15    showing by a defendant, I say, "Although the Government may

16    argue that Section 3504 is not applicable to FISA it has been

17    used before to secure notice of FISA surveillance."  And it

18    was done so in the United States versus Hamide which is from

19    the Ninth Circuit in 1990.

20          THE COURT:  Okay.  All right.  Okay.  That's

21    helpful.  Thanks.

22          MR. DALACK:  Yes.  No problem.

23          THE COURT:  All right.  How about I hear from Ms.

24    Arbittier then -- Ms. Williams, rather, and then I'll give you

25    a chance for a reply.

1          MR. DALACK:  Thank you, Your Honor.

2          THE COURT:  Thank you.  All right.  Good afternoon.

3          MS. WILLIAMS:  Good afternoon, Your Honor.

4          First of all, I want to make it very clear that

5    nothing I said in my response or in court here today is

6    commenting on what classified techniques were used, if any,

7    what information was gathered.  I have certainly not admitted

8    to a whole cache of classified evidence being out there.  I'm

9    discussing all of this is an unclassified way and, therefore,

10   I cannot get into what classified evidence, if any, has been

11   gathered.

12         THE COURT:  Right.

13         MS. WILLIAMS:  I also want to clarify, and I did do

14   this in my response, but the one indication in the search

15   warrant affidavit where the Government says it relied on other

16   lawful search warrants that is not a reference to anything

17   classified.

18         As I say in footnote two in my response that is a

19   reference to an unclassified standard search warrant on a

20   third party Facebook account.  That third party was

21   communicating with Ms. Thomas.  That's the search warrant the

22   Government was referring to.

23         All of those search warrant returns were turned over

24   to Ms. Thomas in discovery, but Ms. Thomas does not have

25   standing to challenge the search warrant itself because it was

1    not her account.  It's a third party account, so she does not

2    have standing.  That is what that reference is to.

3            The Government, and I've made this very, very clear

4    by repeating it in my response, is not relying in any way in

5    this case on any information that was gathered through a

6    classified technique.

7            THE COURT:  Okay.

8            MS. WILLIAMS:  So the -- the biggest confusion I

9    found in the defendant's motion is that it's ignoring the

10   distinction that arises when there is a classified component

11   to a case.

12           None of the cases, save that footnote and the

13   general discussion of classified techniques, requires

14   disclosure as the defense is arguing when there are classified

15   techniques.

16           There are statutes that govern when there are

17   classified techniques involved that protect a defendant's

18   rights to receive any evidence that might be exculpatory or

19   helpful to the defense, but also recognizes the very important

20   national interest that is served in protecting our nation's

21   security through the protection of classified techniques.

22           Therefore, in a CIPA motion the Government may lay

23   out all of the classified techniques and then -- and also lays

24   out what the national security concerns are.  Therefore, the

25   Judge has an opportunity to weigh both and decide if a

1    protective order should be issued.

2            The one thing that the defense keeps forgetting is

3    that a CIPA motion was filed in this case and, therefore, I am

4    not deciding on my own for selfish reasons that evidence is

5    not discoverable.

6            Things were disclosed to the Court.  The Court had

7    an opportunity to consider everything in that CIPA motion and

8    make an informed decision about whether a protective order was

9    appropriate.

10           And so I remind the Court and, again, remind the

11   defense that this is not the Government deciding on its own.

12   In fact, there was a CIPA motion filed and the Court had a

13   complete opportunity to consider everything and did, in fact,

14   grant the protective order.

15           THE COURT:  Okay.

16           MS. WILLIAMS:  So just going through some of the

17   defendant's arguments.

18           THE COURT:  All right.  Well, let me just follow up

19   the one -- one of the questions I had.  All right.  The

20   defense agrees that this is similar to a fruit of the

21   poisonous tree argument.  Okay.  Which is a helpful analogy

22   because there's a lot of case law under that.

23           So your position is that you have turned over the

24   affidavits for all the search warrants that were used in this

25   case, is that correct?

 1              MS. WILLIAMS:  Yes, of the -- that the defendant has

 2     standing to challenge.

 3              THE COURT:  Right.  Okay.

 4              MS. WILLIAMS:  All of the search warrant of the

 5     defendants.

 6              THE COURT:  All right.  And that -- that led to

 7     securing any of the evidence you're going to use at the trial?

 8              MS. WILLIAMS:  Correct.

 9              THE COURT:  Okay.  And in those affidavits -- I

10     haven't read them, at least not recently -- were they in part

11     based on surveillance techniques?  Can you -- can you answer

12     that yes or no?

13              MS. WILLIAMS:  There is nothing based on classified

14     surveillance techniques or classified techniques of any sort

15     in those search warrants.

16              The only reason I hesitated is because the defense

17     called that one reference to other lawful search warrants a

18     reference to other surveillance.  That was an unclassified

19     search warrant as I explained.  There is no other reference to

20     any other surveillance techniques or anything classified at

21     all in those affidavits.

22              THE COURT:  All right.  And that's a categorical

23     representation, right?

24              MS. WILLIAMS:  Yes.

25              THE COURT:  Okay.  Now, you say one of the search

1    warrants has a reference to some unclassified surveillance, is

2    that correct?

3              MS. WILLIAMS:  To an unclassified search warrant of

4    a third party's account.

5              THE COURT:  Oh, a search warrant.  Okay.  And you're

6    not in a position to reveal who third party is?

7              MS. WILLIAMS:  To be honest, Your Honor, it's one of

8    the associates that's referenced in the complaint, but I can't

9    recall which one it is right now.  But all of that discovery

10   has been turned over, so I'm sure the defense --

11             THE COURT:  That would be an individual?

12             MS. WILLIAMS:  Yes.

13             THE COURT:  An associate of Ms. Thomas?  Allegedly

14   associate?

15             MS. WILLIAMS:  Correct.

16             THE COURT:  Okay.  Okay.  All right.  So I

17   interrupted you.  Go ahead.

18             MS. WILLIAMS:  Your Honor, the -- the most basic

19   principle that I wanted to express in my response is -- is

20   really what I see as the fatal flaw in the defendant's

21   argument and that is the defendant is only entitled to notice

22   and discovery of surveillance if, in fact, they -- there is a

23   suppression motion that could arise from the Government's use

24   of that surveillance.  And that is the case whether we're

25   looking at unclassified surveillance because Section 3504

1    entitles to notice and discovery of surveillance when there's

2    a colorable claim that evidence is inadmissible because it was

3    obtained by unlawful surveillance.

4           And similarly under FISA there is a notice

5    requirement, as the defense said, but it is not overarching.

6    Defendants are not always entitled to know when FISA is used.

7    The FISA notice requirement is -- it applies only if the

8    Government intends to enter into evidence or otherwise use or

9    disclose material obtained by FISA, again, against a aggrieved

10   person.

11          On the unclassified side, all of the search warrants

12   that the Government will -- from which the Government gathered

13   evidence and it will be using in this case, that's all been

14   turned over.  The request for unclassified discovery here is

15   really moot because it has all been turned over.

16          On the classified side it is also moot or without

17   merit because the Government -- the FISA notice requirement

18   does not apply.  The Government is not intending to enter into

19   evidence or otherwise use or disclose FISA information and I'm

20   saying that categorically.

21          And to the extent the Court has any doubts the Court

22   has a classified CIPA motion that the Court may review.

23          Executive Order 12333, the defense claims that that

24   is untested.  There is no way the defense can have access to

25   that.  There's no notice requirement.  That's not exactly

1    right.   In fact, the FISA notice requirements apply for

2    evidence collected under that Executive order and, again, the

3    same notice requirements apply.

4           And to the extent the Court has any doubt about what

5    techniques were used the Court can refer to the CIPA motion

6    and not rely solely on the Government.

7           With regard to the collection of third party records

8    through some classified manner, whether National Security

9    Letters or FISA, Section 215 of the Patriot Act which amended

10   portions of FISA, there is no notice requirement associated

11   with that similar -- similarly to the fact that there's no

12   notice requirement with the service of Grand Jury subpoenas.

13          Both procedures request third party business

14   records, just like Grand Jury subpoenas request third party

15   business records.   And there is, therefore, no suppression

16   remedy available because these are records obtained from the

17   third party.

18          And the Government cites U.S. versus Miller, a

19   Supreme Court case confirming that issuance of a subpoena to a

20   third party does not violate the rights of a defendant.   And

21   then I also cited a statute and a case extending that to the

22   classified process.

23              THE COURT:   Okay.   All right.

24              MS. WILLIAMS:   With regard to the one case --

25              THE COURT:   So let me just ask you this question.

1           MS. WILLIAMS:  Yes.

2           THE COURT:  I'm aware of the fact that there's not

3  been a motion to suppress.  Mr. Dalack or Ms. Toplin or Ms.

4  Gaughan, do you intend to file any motions to suppress or do

5  you know?

6           MR. DALACK:  It's very much contingent on whether or

7  not we're able to have full notice and discovery of all the

8  surveillance and searches and seizures that were conducted in

9  this case.  Otherwise without that information it's sort of

10 like boxing --

11          THE COURT:  Well --

12          MR. DALACK:  -- in the dark.

13          THE COURT:  You know, I don't know if this is the

14 donkey and the cart, you know, which comes first.  I mean,

15 maybe your -- your argument would be stronger if you filed a

16 motion to suppress first and you identified specific evidence

17 you claim was secured by the fruit of the poisonous tree.

18          MR. DALACK:  The problem is that creates a circular

19 argument that the Government can conveniently rely on because

20 without any notice and discovery of those searches and

21 seizures we can't actually make a colorable argument that it

22 was fruit of the poisonous tree.

23          If I may, Your Honor?  In the stingray context there

24 was a recent decision out of the Southern District of New

25 York, United States versus Lambis.  If I may approach?

1          THE COURT:  Yes.  All right.  I'm sorry I

2   interrupted you.

3          MS. WILLIAMS:  That's okay.

4          THE COURT:  You can just hand it to --

5          MR. DALACK:  Yes.

6          THE COURT:  Thanks.  Okay.  All right.  Do you have

7   a copy for Ms. Williams?  This is United States versus Raymond

8   Lambis, L-A-M-B-I-S, Criminal 15-734.  Decision by Judge

9   Pauley, P-A-U-L-E-Y.  Okay.  Thank you.

10          (Pause)

11          MR. DALACK:  I think this case is --

12          THE COURT:  Well, let me -- let me ask you, Ms.

13   Williams, I mean, do you think that I should make the

14   defendant file a motion to suppress before I rule on this?  Or

15   I mean, do you think they're -- they could raise this issue

16   again if it was tied to a motion to suppress?

17          MS. WILLIAMS:  Your Honor --

18          THE COURT:  I don't want to -- look, I know strategy

19   plays an important role for everybody in these cases and I

20   don't want to dictate to one side or the other how they should

21   go about representing their client.  Go ahead.

22          MS. WILLIAMS:  I don't see that the actual filing of

23   a motion to suppress will make a difference.

24          THE COURT:  Okay.

25          MS. WILLIAMS:  Because they're -- I guess the only

1     way it could make a difference is if in their motion to

2     suppress the criminal search warrants the Government were to

3     then reveal that actually some of that was based on FISA, but

4     I'm telling the Court and the defense that the Government is

5     not in any way relying on anything obtained --

6                   THE COURT:  Okay.

7                   MS. WILLIAMS:  -- via classified techniques.

8                   THE COURT:  All right.

9                   MS. WILLIAMS:  So I don't see that the filing of a

10    suppression motion would get us any closer to a resolution

11    because no Court has ever adopted the discovery paradigm that

12    the defense is arguing here that the Government must give an

13    accounting of every surveillance technique, classified and

14    unclassified, regardless of its relationship to any potential

15    suppression motion which is really what they're asking.

16                   And, more importantly, no Court has ever, and I know

17    this, no Court has ever held that notice of FISA activity must

18    be provided outside of the statutory scheme contained within

19    FISA.

20                   Really this motion read to me like an attack of the

21    Government's classified investigative techniques overall.  Not

22    EDPA Government, not Jennifer Williams Government, but the

23    United States Government.

24                   THE COURT:  Yes.

25                   MS. WILLIAMS:  It really read as a challenge to

1   classified investigative techniques except that that is not a

2   dispute for this Court to resolve.  That is not appropriate

3   for this motion.  It really is incendiary, but doesn't have

4   any relevance to the discovery -- the Government's discovery

5   obligations and conduct in this case.

6          The Government, as I said, has disclosed to the

7   Court information via CIPA.  The Government is not hiding

8   anything.  CIPA authorizes ex parte in-camera consideration of

9   classified information for purposes of a protective order.

10         CIPA also expressly permits a Court to order the

11  Government to substitute an unclassified version of evidence

12  that had already been obtained via classified techniques.  So

13  this whole parallel construction idea that the defense argues

14  is withholding information from defendants is authorized by

15  statute and Court's are absolutely permitted to do it.

16         So the whole CIPA scheme, the whole FISA scheme,

17  that protects all of the interests that the defendant is

18  claiming needs to be protected here.

19         If I may just have a moment, Your Honor?

20         THE COURT:  Sure.

21         (Pause)

22         MS. WILLIAMS:  Your Honor, I did want to say that I

23  found other defense motions that were quite similar to this in

24  other cases around the country where they discussed known

25  unknowns and unknown unknowns.  That was language I found in

1    other defense motions.  But they were filed in cases in which

2    FISA notices were produced because the Government was, in

3    fact, relying upon FISA drive information.

4              This is not the case for this motion because the

5    Government is not relying on any information obtained via

6    classified techniques and all unclassified search warrant

7    affidavits have been produced.

8              THE COURT:  Okay.

9              MS. WILLIAMS:  Thank you.

10             THE COURT:  Thank you.  Okay, Mr. Dalack.

11             MR. DALACK:  Yes, Your Honor.

12             (Pause)

13             MR. DALACK:  Your Honor, the problem with the

14    Government's argument is that it's a trust us argument.

15             THE COURT:  Well --

16             MR. DALACK:  It's saying that --

17             THE COURT:  -- not -- not entirely.

18             See, well, I don't -- I don't mean to say that you

19    have to do this, but, you know, Judges are used to a fruit of

20    the poisonous tree argument being made in the context of a

21    motion to suppress.

22             MR. DALACK:  Yes, Your Honor.

23             THE COURT:  That you want to prevent the Government

24    from using some evidence that you say they've seized

25    illegally.

 1              MR. DALACK:  Yes.

 2              THE COURT:  Generically, that sounds like the

 3     argument you're making.

 4              MR. DALACK:  Not yet.

 5              THE COURT:  Well --

 6              MR. DALACK:  We're not at that point yet.

 7              THE COURT:  Well, you're saying not yet, but --

 8              MR. DALACK:  In fact --

 9              THE COURT:  I don't --

10              MR. DALACK:  -- we can't actually make that

11     argument.

12              THE COURT:  See, here's the thing.  You know what

13     evidence the Government has.  Okay.  I mean, you accept the

14     fact that they've let you know what evidence they have.  What

15     recordings, what -- what conduct your client took.

16              MR. DALACK:  No.

17              THE COURT:  No?

18              MR. DALACK:  That's not what we're saying because

19     we're actually saying that we don't have all of it because the

20     Government has neither affirmed nor denied whether it used any

21     of these classified procedures.  The issue is that in --

22              THE COURT:  Well, all right, we're -- we're not

23     speaking directly.

24              The Government said that one of things your client

25     did was get a passport, right?

1          MR. DALACK:  Yes, Your Honor.

2          THE COURT:  Okay.  Now, I don't know if that's true

3    or not.  Okay.  But they allege that your client went to get a

4    passport and they'll -- now, I assume for a fact that they may

5    have seized her passport.

6          MR. DALACK:  Okay.

7          THE COURT:  Do you know that?

8          MR. DALACK:  I don't know that for a fact at this

9    point.

10          THE COURT:  You don't know that for a fact?  Well,

11    it's likely.

12          MR. DALACK:  Yes.

13          THE COURT:  Okay.  Or maybe a copy of it.

14          MR. DALACK:  Yes.

15          THE COURT:  Or maybe they got a copy of it from the

16    Passport Office if not from your client.

17          MR. DALACK:  Yes, Your Honor.

18          THE COURT:  Okay.  Now, so that's a piece of

19    physical evidence that the Government is likely to want to

20    introduce at the trial.

21          MR. DALACK:  Yes.

22          THE COURT:  Okay.  Now, there's nothing, per se,

23    illegal about getting a passport.  Right.  But the

24    Government's going to try and tie it in to the allegations

25    against your client in the -- in the affidavit -- in the

1    indictment.

2           Now, I don't know how the Government went about

3    finding out the fact that your client got a passport.  Maybe

4    they went to the Passport Office and they got it that way just

5    as -- within the Government and they didn't need any kind of

6    search warrant.

7           MR. DALACK:  Okay.

8           THE COURT:  Maybe they searched your client's house

9    and they found it in her house in which event it would have

10   been listed on an inventory of the results of a search

11   warrant, correct?

12          MR. DALACK:  Correct.

13          THE COURT:  Okay.  Now, there are other ways they

14   may have gotten her passport.  Now, I don't know if you want

15   to, as a matter of strategy, move to suppress the passport.

16   I'm just picking a piece of evidence.

17          MR. DALACK:  I understand.

18          THE COURT:  All right.  But I think, you know,

19   you're calling -- you see, you're calling on the Government to

20   independent of filing any kind of motion --

21          MR. DALACK:  Yes.

22          THE COURT:  -- to reveal everything that they may

23   have done in investigating your client.

24          MR. DALACK:  No, Your Honor.

25          THE COURT:  Or surveillance -- including

1    surveillance.

2              MR. DALACK:  That they actually used.

3              THE COURT:  Yes.  Okay.

4              MR. DALACK:  So this is not an indictment --

5              THE COURT:  Any kind of surveillance.

6              MR. DALACK:  -- of U.S. surveillance policy.

7              THE COURT:  All right.

8              MR. DALACK:  This is a narrowly tailored request.

9              THE COURT:  Now, maybe they had an FBI agent, you

10   know, in a car across the street from your client's house for

11   a day, a week or a month.  I don't know.  We all know from

12   watching, you know, detective movies and so forth that that's

13   sometimes what policemen do.

14             MR. DALACK:  Yes.

15             THE COURT:  They sit in the car and they watch

16   what's going on.  Okay.

17             MR. DALACK:  I actually like that example quite a

18   bit, Your Honor, because it ties in very nicely to the analogy

19   that I would like to make with the case that I just presented

20   you out of the Southern District.  That was the Government's

21   use of stingray surveillance to pinpoint a defendant's

22   location inside of an apartment building.

23             THE COURT:  Okay.

24             MR. DALACK:  Now, in that case had the Government

25   not given the defense notice, so hypothetically --

1              THE COURT:  Yes.

2              MR. DALACK:  I'm giving you a hypothetical based off

3    of this case now.

4              If the Government had pinpointed the defendant's

5    location inside of that apartment using the stingray

6    surveillance and then said, okay, we'll sit on this

7    information.  We'll sit -- we'll assign some FBI agents

8    outside of the apartment and wait until they see the defendant

9    enter and exit and see if we can follow him to see which house

10   he goes into.

11             In that case had the Government done that they could

12   have masked the original source of their information

13   concerning the defendant's location by saying we didn't get it

14   from the stingray or you don't have to know about the stingray

15   because we're not relying on the stingray.  We saw him

16   actually go into the apartment and thereby totally hide from

17   the Court and keep the defense and the Court oblivious to the

18   fact that stingray surveillance was actually used.  That

19   would, obviously, be unacceptable and inappropriate because --

20             THE COURT:  So you want to know why -- let's assume

21   the Government used surveillance in this case.  Let's just

22   assume that.

23             MR. DALACK:  Okay.  It's a safe assumption.

24             THE COURT:  Okay.  So you -- what, sorry?

25             MR. DALACK:  A safe assumption.

1           THE COURT:  Okay.  So you want to know how they were

2     tipped off to start surveillance.  Is that what you're saying?

3           MR. DALACK:  We want to know what techniques they

4     actually used.

5           THE COURT:  Well, you say techniques.

6           MR. DALACK:  Yes.

7           THE COURT:  I mean, maybe they had an informant who

8     -- who called up the local police station or the local FBI and

9     said I -- you know, I'm a neighbor of Ms. Thomas.  I suspect

10    that she's thinking of joining the Islamic State.

11          MR. DALACK:  Right, but that's --

12          THE COURT:  Just assume that.

13          MR. DALACK:  Okay.

14          THE COURT:  All right.

15          MR. DALACK:  Okay.

16          THE COURT:  And the next thing that the FBI did is

17    they put some -- an agent in the car across the street from

18    her front door and started watching her.

19          MR. DALACK:  Okay.

20          THE COURT:  Now, are you saying -- now, see, I'm

21    getting back to the informant.  You say you're not interested

22    in informants, but let's assume it was an informant that led

23    the FBI to start surveillance.

24          MR. DALACK:  Okay.

25          THE COURT:  Are you saying you're entitled to know

1    the identity of the informant?

2              MR. DALACK:  Well, we're certainly entitled to

3    assess the credibility of that informant.  Absolutely.

4              THE COURT:  Well, I'm not sure --

5              MR. DALACK:  And I think that --

6              THE COURT:  -- that's right because the FBI is not

7    -- they don't -- they're not going to call the informant at

8    trial.  But they started the surveillance based on an -- I'm

9    not aware of any law that -- any case that says you have to

10   have probable cause to start a surveillance of a -- of

11   somebody who later becomes indicted, are you?

12             MR. DALACK:  Sure, but the tip has to provide a

13   sufficient indicia of reliability.  There are other factors

14   that are at issue.

15             THE COURT:  To start a surveillance?

16             MR. DALACK:  Well, the problem is we're not talking

17   about informants.  We're talking about surveillance

18   techniques --

19             THE COURT:  Well, you're not talking --

20             MR. DALACK:  -- that absorbed her communications.

21             THE COURT:  You keep saying you're not talking about

22   informants because I think that -- that doesn't leave you to

23   any successful result.  I mean, I'm limiting you --

24             MR. DALACK:  No, I don't think so.

25             THE COURT:  I'm taking your word as -- you limited

1    your motion that you're interested in surveillance.  Okay.

2              MR. DALACK:  Okay.

3              THE COURT:  Now, you know, the FBI and the Police

4    Department they may do lots of surveillance.  For example,

5    we've got the DNC coming here this weekend.  Okay.

6              MR. DALACK:  Yes, Your Honor.

7              THE COURT:  Having been a prosecutor a long time ago

8    my hunch is that our Police Department has an idea who are

9    some potential troublemakers and they are under surveillance

10   as we speak or they will be starting Sunday and Monday.

11             MR. DALACK:  It might be me --

12             THE COURT:  Let's just --

13             MR. DALACK:  -- after this hearing.

14             THE COURT:  Let's -- right, let's just assume that.

15   All right.  That's normal police behavior.  That's what law-

16   abiding citizens want.

17             Now, let's assume -- but Philadelphia has a million

18   and a half people.  There aren't enough police officers to

19   surveil all million and a half people.

20             MR. DALACK:  Okay.

21             THE COURT:  So let's say the Police Department has

22   identified 500 who are potential troublemakers at the DNC.

23   This has nothing to do with foreign intelligence or terrorism

24   or anything like that.

25             MR. DALACK:  Okay.

1          THE COURT:  Okay.  Now, if one of those people ended

2    up getting arrested, okay, as a result of the surveillance.

3    Let's say the police saw them coming out of their house with a

4    machine gun.  Let's just assume that.

5          MR. DALACK:  Okay.

6          THE COURT:  Okay.  And they were arrested.  Is that

7    individual -- is that defendant entitled to know what led the

8    police to start surveillance?

9          MR. DALACK:  To the extent it could bear on a motion

10   to suppress the machine gun, but the Government may be able to

11   raise other arguments.

12         THE COURT:  Well, wait, but the guy -- in my hypo

13   the person comes out of the house and the machine gun's in

14   place sight.

15         MR. DALACK:  Sure.

16         THE COURT:  It so happened the police were there

17   watching for it because of an --

18         MR. DALACK:  Right.

19         THE COURT:  -- some kind of tip.

20         MR. DALACK:  And in that case that would be an

21   exception to the Fourth Amendment's preclusion --

22         THE COURT:  Okay.

23         MR. DALACK:  -- of unreasonable search and

24   seizures --

25         THE COURT:  Yes.

1              MR. DALACK:  -- because it's a plain view exception.

2              THE COURT:  But that would be tested by a motion to

3       suppress.  Okay.

4              MR. DALACK:  Right.  But that's what I'm saying --

5              THE COURT:  Yes, but --

6              MR. DALACK:  -- is that we can't even get to that

7       point, Your Honor.

8              THE COURT:  Yes, but you see -- but I don't know any

9       case law in my situation, my hypo, would require a -- would

10      authorize a Judge to require the police to say why they

11      started surveilling this individual.

12             MR. DALACK:  Well, this is a different body of case

13      law because that --

14             THE COURT:  No, it's not.

15             MR. DALACK:  -- that --

16             THE COURT:  There I beg to differ with you.

17             MR. DALACK:  Well, that turns on whether or not the

18      individual has, upon raising a suppression motion, standing to

19      suppress any of --

20             THE COURT:  Well, they do.

21             MR. DALACK:  -- any of that information.  Right.

22             THE COURT:  He's carrying the machine gun.

23             MR. DALACK:  They're carrying the machine gun and

24      whether any exception applies.

25             THE COURT:  Right.

1          MR. DALACK:  And to the extent that when it comes to

2     the use of informants there is a robust case law discussing

3     what the Government must disclose when informants are at

4     issue.  And that naturally weighs -- militates very favorably

5     in my point because there's no case law concerning the

6     Government's use of surreptitious surveillance and the

7     legality of it in criminal prosecutions.  So we want that to

8     happen here.  We want the Court to be able to say --

9          THE COURT:  Right.

10         MR. DALACK:  -- through an adversarial --

11    adversarial proceeding --

12         THE COURT:  Yes, but -- I haven't read this case

13    from Judge Pauley, but I'm not aware of any case that's ever

14    -- where a Judge has ever required law enforcement, police,

15    FBI, anybody, to turn over the facts that led them to start a

16    surveillance of somebody because it -- the cases generally

17    hold that it's not illegal to -- to conduct a surveillance

18    because people --

19         MR. DALACK:  But it may be illegal --

20         THE COURT:  What?

21         MR. DALACK:  It may be illegal to --

22         THE COURT:  People don't know -- wait a minute.  But

23    people don't know they're being surveilled.  Maybe they think

24    they're being surveilled.  You know, if you read espionage

25    novels --

1              MR. DALACK:  Sure.

2              THE COURT:  -- you see -- you hear a lot about that.

3    Okay.  But it's not a violation of somebody's right to be

4    under surveillance because, you know -- well, if you're -- if

5    you're committing a crime, well, then you're -- you're pretty

6    stupid to be committing it while somebody else is watching

7    you.

8              MR. DALACK:  I understand.

9              THE COURT:  If you're not committing a crime, well,

10   your rights haven't been violated.  You know, somebody's

11   watching you, but you're not doing anything illegal.

12             MR. DALACK:  That's contrary to what the Second

13   Circuit held in ACLU versus Clapper when it found that the

14   bulk collection --

15             THE COURT:  Well, let me -- let me -- is that in

16   your brief?

17             MR. DALACK:  It is, Your Honor.

18             THE COURT:  What's that case?

19             MR. DALACK:  ACLU versus Clapper.  I actually have a

20   copy for you as well.

21             THE COURT:  I've heard of that case.

22             MR. DALACK:  Yes.

23             THE COURT:  I haven't read it.

24             MR. DALACK:  That's contrary to what the Court held

25   in that case where it found that the petitioners there

1   actually had standing to challenge the Government's bulk

2   collection of their telephoning metadata simply because it

3   was --

4           THE COURT:  All right.  I'm familiar with that case.

5           MR. DALACK:  Right, so --

6           THE COURT:  That's not -- that's not surveillance.

7           MR. DALACK:  That certainly is surveillance.

8           THE COURT:  Well --

9           MR. DALACK:  It's bulk collection of metadata about

10  their activities.

11          And it's important to note that Ms. Thomas is an

12  aggrieved person under any of the statutes pertaining to

13  electronic surveillance simply if her communications were

14  swept up in the course of another --

15          THE COURT:  Well, see, now we're talking about

16  something.  All right.  Now, you've moved from physical

17  surveillance which is what I'm talking about.

18          MR. DALACK:  To electronic surveillance which is the

19  subject of the motion.

20          THE COURT:  To electronic surveillance.

21          MR. DALACK:  Yes.

22          THE COURT:  Okay.  All right.  Now, what's your

23  argument specifically about electronic surveillance?  I mean,

24  have you gotten the fruits of electronic surveillance in the

25  evidence the Government has produced?

1          MR. DALACK:  No, we don't know.  We don't know what

2    electronic surveillance was used.  We don't know the extent to

3    which they used --

4          THE COURT:  You don't have --

5          MR. DALACK:  -- any surreptitious techniques.

6          THE COURT:  There's no emails that they've turned

7    over that they're --

8          MR. DALACK:  Well, they -- they claim that got all

9    of these through Rule 41 search warrants, but, again, that

10   doesn't -- so what the Government is saying is --

11         THE COURT:  Well --

12         MR. DALACK:  If I may, Your Honor?

13         THE COURT:  Yes.

14         MR. DALACK:  What the Government is saying is that

15   our evidence that we found through the Rule 41 search warrants

16   is not derived or obtained through any classified surveillance

17   techniques.  That's not an independent determination that

18   we're able to credit without a full --

19         THE COURT:  Well, Ms. Williams says --

20         MR. DALACK:  -- fleshing through --

21         THE COURT:  Wait a minute.

22         MR. DALACK:  -- an adversarial proceeding.

23         THE COURT:  Well, Ms. Williams made a representation

24   that there's no -- there's been no classified techniques that

25   were used in this case that has led --

1              MR. DALACK:  I don't think she said that.

2              THE COURT:  -- that has led to the evidence the

3      Government wants to use.

4              MR. DALACK:  And that's the problem because the

5      Government construes what derived from mean so narrowly so as

6      to preclude defendants from actually receiving notice.

7              THE COURT:  Well, okay, but you see --

8              MR. DALACK:  It's the reason why defendants went

9      five years without receiving FISA notice under the statute

10     even though the Government directly relied on it because the

11     National Security Division attorney said --

12             THE COURT:  Okay.

13             MR. DALACK:  -- defendants don't have a right to

14     this.

15             THE COURT:  All right.  But that's another legal

16     principle, you know.  You know, for all I know the Government

17     may have been doing electronic surveillance of me or my law

18     clerk or anybody else here in this courtroom, but we're not

19     entitled -- at least as far as I know there's no case that

20     we're entitled to know about that unless the Government wants

21     to use it against us in some kind of proceeding.

22             MR. DALACK:  Whether it's derived.  That's the

23     problem.  Whether it's the fruit of the poisonous tree --

24             THE COURT:  Well, we know from news --

25             MR. DALACK:  -- is not something they can

1    independently determine.

2            THE COURT:  -- reports of Mr. Snowden and the NSA

3    that, you know, the NSA has been -- National Security Agency

4    they've been collecting phone records for millions of American

5    citizens for years.

6            MR. DALACK:  Right.  And the --

7            THE COURT:  Wait, wait, let me just finish.

8            MR. DALACK:  Okay.

9            THE COURT:  Okay.  But as far as I know there's no

10   content.  It's just numbers that have been called or been

11   dialed.

12           MR. DALACK:  Well, that's not always the case.

13   Certainly it's content that's swept up --

14           THE COURT:  Well --

15           MR. DALACK:  -- through Executive Order 12333.

16           THE COURT:  Well --

17           MR. DALACK:  And --

18           THE COURT:  Well, but Ms. Williams said they're not

19   using anything secured by that, but here's the point.  You

20   know, if -- if your argument was taken to the logical

21   conclusion any time anybody was accused of a crime --  let's

22   say whether it's, you know, using false postal stamps to mail

23   a letter, something fairly innocuous, okay, they could come

24   into court and they would want to know all the surveillance

25   that was used against them by the NSA in collecting their

1   phone records for the last five years, 20 years?  Is that --

2   is that what you're saying?

3              MR. DALACK:  Well, to the extent that the Government

4   collects information, content and metadata through Section 702

5   of the FISA Act, okay, of FISA --

6              THE COURT:  The Government, they have a bunch of it,

7   but all this person is accused of is having a -- not mailing a

8   letter properly.

9              MR. DALACK:  Right.  And in --

10             THE COURT:  It's a misdemeanor.

11             MR. DALACK:  A good attorney, I would submit -- I

12  would submit would in a discovery letter to the Government ask

13  was the Government conducting any back door searches of

14  American metadata incidentally collected under Section 702 to

15  acquire information about the defendant?  And, if so, to what

16  extent did the Government rely on that information?

17             We don't have to speculate like that as much.  We're

18  forced to speculate a bit because we don't have notice and

19  discovery, but in our case we know that all of the national

20  security surveillance tools that the Government has available

21  to them they could have just have easily used in this case to

22  collect all of the evidence that they do intend to introduce

23  against Ms. Thomas --

24             THE COURT:  Okay.

25             MR. DALACK:  -- at trial.

1          THE COURT:  Okay.  Okay.  You see, here's the

2     fundamental issue that I have.

3          MR. DALACK:  Okay.

4          THE COURT:  And if I'm not understanding your

5     argument tell me.  You want to know -- and you're representing

6     your client and you're doing a good job and I don't blame you

7     for this, but I -- it seems that you're stretching the -- the

8     Government's obligations.  Your client's been charged with a

9     serious crime.

10         MR. DALACK:  Very serious.  Yes.

11         THE COURT:  And they have -- the Government has

12    provided you with the evidence they intend to use.

13         Your argument is the Government may have other

14    evidence they've collected about your client that they don't

15    intend to use, but I don't know what this is and I think I'm

16    entitled to know that -- what is -- because it may have led

17    the Government to some of the evidence they are going to use.

18    Is that -- is that your argument?

19         MR. DALACK:  It's not -- the problem is the

20    intention component.  What's critical to our argument is that

21    the Government cannot make an ex parte independent

22    determination that it is not intending to use evidence that

23    was generated by classified surveillance programs to the

24    defendant's detriment.

25         We should be able to test through an adversarial

1   proceeding whether the actual searches and seizures that were

2   used helped to generate any of the evidence that the

3   Government intends to introduce at trial.

4            And, again, I go back to a very specific point.  I

5   would submit that if you were to ask Ms. Williams what the

6   Government's definition of derived is under FISA's notice

7   statute I don't know if she'd be able to articulate what the

8   Government's position on what derived evidence means because

9   the Government has not --

10           THE COURT:  Okay.

11           MR. DALACK:  -- publicly made this available.

12           THE COURT:  Okay.  Let me go back to my -- this poor

13   man whose been charged with, you know, having a phoney postage

14   stamp.  Okay.

15           MR. DALACK:  Okay.

16           THE COURT:  And let's assume that he's a committed

17   spy for some foreign country.

18           MR. DALACK:  Okay.

19           THE COURT:  Okay.  Committed.  Okay.  And the

20   reality is that the Government -- all -- many agencies of the

21   Government have -- they have been following him, they've been

22   wiretapping him, they've been eavesdropping for years.

23           MR. DALACK:  Yes.

24           THE COURT:  But all he's charged with is affixing a

25   false postage stamp to a letter.  The penalty is 90 days.

1          MR. DALACK:  Okay.

2          THE COURT:  Now, would his lawyer be able to make

3    this argument?

4          MR. DALACK:  To the extent there is a belief that

5    any of the evidence that was --

6          THE COURT:  Just a belief?  Don't you need some

7    support for it?

8          MR. DALACK:  We don't -- well, our support for it is

9    that this a national security prosecution and that the

10   Government has these tools at their disposal.

11         We would request a bit of -- a benefit of the doubt

12   in this case because for our -- as far as our burden of

13   persuasion is concerned we don't have the material.  Really,

14   that's the whole point.

15         THE COURT:  Okay.

16         MR. DALACK:  We need the material necessary --

17         THE COURT:  Okay.  Now --

18         MR. DALACK:  -- to really litigate this.

19         THE COURT:  Okay.  Now, let me come back to the

20   motion to suppress because it would seem to me -- and I'm not

21   being critical.

22         MR. DALACK:  Okay.

23         THE COURT:  Just an observation.  That your

24   argument, although very well stated, is really a hypothetical

25   because you don't know for a fact what there -- if there is

1    anything out there let alone what it is.

2              But if you were to file a motion to suppress and you

3    were to point to specific -- specific items of physical

4    evidence that you know the Government has, like the passport

5    being one example, or --

6              MR. DALACK:  Or communications?

7              THE COURT:  Or communications.  You could move to

8    suppress that.

9              MR. DALACK:  The --

10             THE COURT:  And then the Judge, me in this case, I

11   could then focus on that and you might have grounds to make me

12   inquire of Ms. Williams in that situation that I want to see

13   something ex parte or in-camera or something like that to

14   satisfy myself that you're not using any of this classified

15   information -- the Government's not using any of this

16   classified information which they're not turning over to you

17   to have -- to have gotten the electronic communications that

18   they are now intending to use at trial.

19             MR. DALACK:  The issue with that, Your Honor, is

20   there's really under Alderman no true substitute for fully

21   fledged adversarial proceedings on this question.

22             But to the extent the Government wants to continue

23   to rely on CIPA -- and, again, the law on this is very clear,

24   CIPA does not affect the Government's notice or discovery

25   obligations -- we would like -- we have a solution.  In many

Dalack - Argument                                        60

1   other cases, material support for terrorism cases, defense

2   attorneys have worked directly with the Judge in an ex parte

3   capacity to educate and inform the Judge as to what the Judge

4   should be looking for in really scrutinizing the CIPA.

5            And in this case as a fallback, at a bare minimum,

6   we would certainly request the opportunity to have you go back

7   with a fine tooth comb and look over the CIPA material.

8            And to the extent there are any remotely close

9   questions of whether the evidence that the Government obtained

10  using these classified surveillance techniques helped at all

11  to generate the evidence that it intends to use at trial then

12  we would ask that you then provide us with notice or force the

13  Government to give us notice and discovery of these tactics.

14           THE COURT:  All right.  I didn't find that argument

15  in your brief.

16           MR. DALACK:  I'm -- you may -- if I may, Your Honor,

17  it's because it's not something that we're -- we're

18  necessarily keen on because, again, we submit that we --

19           THE COURT:  Yes, look, I think  --

20           MR. DALACK:  -- we are entitled to a fully fledged

21  adversarial proceeding.

22           THE COURT:  I'm entitled to know your -- your first

23  position and your second position too.  I mean --

24           MR. DALACK:  Admittedly, Your Honor, this is

25  something that I fleshed out after talking to other defense

1    attorneys who have litigated these cases and they instructed

2    that invariably when this procedure happens -- well, first of

3    all, we understand that you've had a chance, albeit, you know,

4    I'm not sure to what extent you've reviewed the classified

5    submissions, but what we're asking now is in light of the fact

6    that we're --

7            THE COURT:  Well, I did.  It was some time ago, but

8    I can't recall --

9            MR. DALACK:  Yes.

10           THE COURT:  -- any details.

11           MR. DALACK:  Is that now that we're at this stage we

12   ask that you go back over that information at a minimum with a

13   fine tooth comb, maybe with the benefit of our ex parte

14   communication with you because there are matters that are

15   sensitive to Ms. Thomas' defense that we could discuss with

16   you in an ex parte capacity that would help to elucidate --

17           THE COURT:  All right.

18           MR. DALACK:  -- why this is such a critical issue.

19           THE COURT:  Okay.  All right.  Well, here's -- let

20   me just put this out there and this is not an order.  It's

21   just something for you to consider.

22           MR. DALACK:  Okay.

23           THE COURT:  I'd like you to consider whether you

24   want to put in writing in the form of a motion or a

25   supplemental brief or whatever the position you just

1   articulated as an alternative and to be as specific as you

2   can.

3           And then what's the deadline for pretrials motions

4   here?

5           MR. DALACK:  I believe before that it was September

6   29th, but it's now been moved to the --

7           THE COURT:  Well, but that was just the motion in

8   limine for the experts.

9           MS. WILLIAMS:  Your Honor, discovery motions were

10  actually due April 1st.

11          THE COURT:  They were due back in March or April.

12          MS. WILLIAMS:  Yes.

13          MR. DALACK:  Well, the -- I mean --

14          MS. WILLIAMS:  But pretrial motions generally are

15  due the same day as motions in limine.  All remaining pretrial

16  motions, non-discovery, will be due September 22nd.

17          THE COURT:  Well, you know, I don't want to wait for

18  -- till September 29th for a motion to suppress.

19          MR. DALACK:  No, no, I think -- if I may, Your

20  Honor?

21          THE COURT:  Yes.

22          MR. DALACK:  I can turn around and get you a motion

23  articulating the alternative that I just explained within two

24  or three days.

25          THE COURT:  Well, you can take a week.  That's fine.

1            MR. DALACK:  Okay.

2            THE COURT:  All right.  Well, now look -- but I'd

3    like to state a deadline for a motion to suppress.

4            MR. DALACK:  Okay.

5            THE COURT:  And there was an order for pretrial

6    motions generally.  Now, what we did today we moved back --

7    that's just the motion in limine for experts.  I don't have a

8    scheduling order in front of me.  Was there -- there was  a

9    deadline for --

10           MS. WILLIAMS:  I have a copy.

11           THE COURT:  -- other kinds of pretrial motions?

12           MS. WILLIAMS:  Your Honor, may I hand my copy up to

13   the Court?

14           THE COURT:  Or you just tell me what it is.

15           MS. WILLIAMS:  It -- honestly, paragraph one,

16   pretrial submissions:

17           (A)  All remaining pretrial motions, including all

18   motions in limine and CIPA Section 5 and 6 motions, shall be

19   filed and served not later than -- and the new date will

20   September 22nd, so they are lumped together.

21           THE COURT:  September 22nd?

22           MS. WILLIAMS:  That -- that's the new date we

23   discussed today.

24           THE COURT:  Well, that's when -- all right, all

25   right.  I think that needs to be moved up.

1           MR. DALACK:  For the motion to suppress?

2           THE COURT:  Yes.  Any kind of pretrial --

3           MR. DALACK:  But that's contingent on whether --

4           THE COURT:  Any kind of pretrial motions --

5           MR. DALACK:  Okay.

6           THE COURT:  -- except the motion in limine.  Well,

7    that -- the motion in limine for experts that's September

8    22nd.  That's a unique motion.

9           MR. DALACK:  Okay.

10          THE COURT:  But I think any other pretrial motion

11   date should be moved up.

12          Now, you know, I'm not saying you have to file a

13   motion to suppress.

14          MR. DALACK:  I understand.

15          THE COURT:  Or what it's going to contain, but --

16          MR. DALACK:  We'll certainly --

17          THE COURT:  -- if you want to consult --

18          MR. DALACK:  -- submit the supplemental.

19          THE COURT:  -- with your colleagues about that.

20          MR. DALACK:  Yes.  We'll certainly submit the

21   supplement based off of the alternative.

22          THE COURT:  Yes, I'd like to fix the date now while

23   we're here.

24          MR. DALACK:  Sure.  What works best for you?

25          THE COURT:  Do you want to talk to your colleagues?

1          MR. DALACK:  Absolutely.

2          THE COURT:  I mean, there may be other motions that

3     you want to file, but I'd like to do it -- to give the

4     Government a chance to respond.  I don't want to ruin

5     anybody's summer vacation either.

6          MS. WILLIAMS:  I'm also confused.  Is Your Honor

7     requesting a supplemental request by the defense with their

8     Plan B that was just discussed here separate and apart from an

9     actual suppression motion?

10          THE COURT:  I don't know.  I'll leave that up to

11    them.

12          MR. DALACK:  I would argue that it would have to be,

13    Your Honor.  We would have to get the decision first on our

14    motion to compel notice and discovery as a precursor to the

15    motion to suppress.

16          THE COURT:  Before you file a motion to suppress?

17          MR. DALACK:  Yes, Your Honor.

18          THE COURT:  All right.  I -- I really disagree with

19    you on that, but that's -- I mean, I can't promise you when

20    I'm going to decide this motion.

21          MR. DALACK:  Can I make a suggestion?

22          THE COURT:  But I mean, I -- I intend to do it

23    within three weeks.  I'll put it that way.

24          MR. DALACK:  Okay.  Can I make a recommendation --

25          THE COURT:  Yes.

 1            MR. DALACK:  -- about the dates?  If we were to set

 2    July 28th as a deadline for this supplemental motion.

 3            THE COURT:  All right.  Yes.

 4            MR. DALACK:  And then once you've ruled on that

 5    three weeks from that date for a motion to suppress?

 6            MR. DALACK:  No, two weeks.

 7            MR. DALACK:  Two weeks?

 8            THE COURT:  Yes.

 9            MR. DALACK:  Okay.

10            THE COURT:  All right.

11            MR. DALACK:  So that's two weeks from when you

12    decide the motion to compel.

13            THE COURT:  All right.  Well, I'm going to try and

14    rule on this by August 19th.

15            MR. DALACK:  Okay.

16            THE COURT:  That's the target.

17            MR. DALACK:  Okay.

18            THE COURT:  So that would mean you'd have two weeks

19    from then.

20            MR. DALACK:  I would just -- if I may, before I

21    conclude, Your Honor?

22            THE COURT:  But, you know, you see, the -- I mean,

23    you can't assume I'm going to grant this motion.

24            MR. DALACK:  I understand.

25            THE COURT:  All right.  So if I deny it --

1          MR. DALACK:  We have to go forward with the motion

2    to suppress.

3          THE COURT:  -- you still have a motion to suppress.

4          MR. DALACK:  Yes.

5          THE COURT:  You know, I --

6          MR. DALACK:  We're preserving the record.

7          THE COURT:  Let me just say this for the record.

8          MR. DALACK:  Yes.

9          THE COURT:  You could -- you could file a motion to

10   suppress tomorrow.  Okay.

11         MR. DALACK:  Okay.

12         THE COURT:  And then you could amend it based on

13   what I do on this motion.  So I can't accept the fact that

14   you're entitled to wait until I decide this before you file a

15   motion to suppress.

16         MR. DALACK:  We strongly --

17         THE COURT:  That may be your strategy, but I don't

18   see it as being a requirement that I decide this before you

19   file a motion to suppress.

20         MR. DALACK:  But is that timeline that we discussed

21   acceptable?

22         THE COURT:  Yes, I'll agree to that, but --

23         MR. DALACK:  Okay.

24         THE COURT:  Yes.

25         MR. DALACK:  Okay.

1          THE COURT:  Okay.  But, you know, things could

2   happen and I can't give you a promise, but -- all right.

3          MR. DALACK:  Okay.

4          THE COURT:  I'm going to make two weeks.  Wait a

5   minute.  I just don't want to leave myself vulnerable here.

6          MR. DALACK:  Sure.

7          THE COURT:  Two weeks from August 19th is September

8   2nd, so the deadline for any kind of pretrial motion is going

9   to be September 2nd.

10         MR. DALACK:  Okay.

11         THE COURT:  Okay.

12         MR. DALACK:  Okay.

13         THE COURT:  Now, I'm going to try and have decided

14  this motion by August 19th, but for any event I don't you're

15  still stuck with September 2nd for motions to compel.

16         And then, Ms. Williams, how much time do you want

17  for response?

18         MR. DALACK:  Motion to suppress you mean, Your

19  Honor?

20         THE COURT:  Motions -- any kind of pretrial motions.

21         MR. DALACK:  Okay.

22         THE COURT:  Including motions to suppress.  Two

23  weeks for a response?

24         MS. WILLIAMS:  Yes, two weeks to respond to motions

25  to suppress and other pretrial motions would be appreciated.

1            I don't know yet whether a Government response will

2      be warranted in response to whatever supplemental filing is

3      going to be --

4            THE COURT:  Well, if he files by July 28th you can

5      respond within in a week to that, so that would be --

6            MS. WILLIAMS:  Unfortunately, Your Honor --

7            THE COURT:  -- August --

8            MS. WILLIAMS:  -- I'm away the following week.

9            THE COURT:  You're away?  All right.  When do you

10     want to file that?

11           MS. WILLIAMS:  If I could have until maybe August

12     11th, so that's two weeks?

13           THE COURT:  Okay.

14           MS. WILLIAMS:  Thank you.

15           THE COURT:  All right.  Thank you.

16           Okay.  All right.  Thanks everybody for coming in.

17     Yes.  Anything else you wanted to say?

18           MR. DALACK:  To conclude I would like to direct your

19     particular attention to the Supreme Court's decisions in

20     Berger versus New York.

21           THE COURT:  Yes.

22           MR. DALACK:  And U.S. versus District Court, the

23     Keith case.  Both of those cases establish -- it's our

24     position that both of those cases conclusively establish that

25     notice and discovery is a condition precedent to a fully

1    fledged motion to suppress.

2              THE COURT:  Okay.

3              MR. DALACK:  And that surveillance statutes or

4    statutes that authorize electronic surveillance are

5    unconstitutional to the extent that they don't provide a

6    notice requirement and that shores up our argument that notice

7    and discovery of the surveillance techniques -- of the

8    surveillance techniques is critical --

9              THE COURT:  Okay.

10             MR. DALACK:  -- to a motion to suppress.

11             THE COURT:  Okay.  What's the second case you

12   mentioned?  U.S. versus --

13             MR. DALACK:  Berger versus New York.

14             THE COURT:  Yes, that I --

15             MR. DALACK:  And then U.S. versus District Court.

16   It's the Keith case.

17             THE COURT:  Do you have a citation for that?

18             MR. DALACK:  And I actually have --

19             THE COURT:  Is it in the brief?

20             MR. DALACK:  It is in the brief.  Yes, Your Honor.

21             THE COURT:  All right.  I'll find it.

22             MR. DALACK:  Okay.

23             THE COURT:  Okay.

24             MR. DALACK:  Thank you very much.

25             THE COURT:  All right.  Thanks for coming in.

1          MS. TOPLIN:  Your Honor, can we just --

2          THE COURT:  Yes.

3          MS. TOPLIN:  -- quickly, the third issue that the

4    Court raised in the beginning of this hearing which is the --

5    which is the request by Mr. Nolen for access to particular

6    documents.

7          THE COURT:  Yes.

8          MS. TOPLIN:  Ms. Williams and I have discussed it.

9    We filed our brief under seal with a tremendous number of

10   attachments.  We have a redacted copy of that that we're

11   prepared to file regularly.

12         Similarly, Ms. Williams filed her brief under seal,

13   her response her seal, in deference to the protection order.

14   However, she agrees that that need not be filed under seal.

15         So if it's acceptable to the Court we'll file our

16   redacted brief with no attachments and the Government will

17   file their response generally without -- publicly.

18         THE COURT:  Okay.  All right.  Okay.  That's fine.

19         But one thing that I just want to say for the

20   record.  You know, I am not prepared or happy about getting

21   requests for legal action -- for judicial action by

22   correspondence.

23         Now, Mr. Nolen qualifies as a journalist so he has

24   some privileges under the Third Circuit's <u>Pansy</u> case, but at

25   some point I may tell him he's going to have to move to

1   intervene to get information.  That would apply to any other

2   third party that wanted information about this case or any

3   other case.

4           Okay.  Thank you very much.

5           MS. WILLIAMS:  Thank you very much, Your Honor.

6           THE COURT:  All right.

7           MR. DALACK:  Thank you, Your Honor.

8           (Proceedings concluded at 3:14 p.m.)

9                       * * *

10

11           **C E R T I F I C A T I O N**

12

13           I, Joan Pace, court approved transcriber, certify

14   that the foregoing is a correct transcript from the official

15   electronic sound recording of the proceedings in the above-

16   entitled matter.

17

18

19

20   _____        August 3, 2016

21   JOAN PACE

22   DIANA DOMAN TRANSCRIBING, LLC