IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 15-171-1 |
| | : | |
| KEONNA THOMAS | : | |

## SEALING ORDER

AND NOW, this _____ day of _____, 2017, the Clerk of Court is directed to file the attached Defendant's Sentencing Exhibits A and B under seal.

BY THE COURT:

_____
THE HONORABLE MICHAEL M. BAYLSON
Senior United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 15-171-1 |
| | : | |
| KEONNA THOMAS | : | |

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

Keonna Thomas, by and through her attorneys, Elizabeth L. Toplin, Assistant Chief, Federal Community Defender for the Eastern District of Pennsylvania, and Kathleen M. Gaughan, Assistant Federal Defender, files this Sentencing Memorandum in support of a fair and just sentence in the above captioned case.

A Presentence Investigation Report has been prepared by United States Probation Officer, Christopher L. Boyer. There are no objections to the report. The recommended guideline sentence is 180 months' incarceration—the statutory maximum penalty. Given the particular facts and circumstances of this case, the defense suggests that a significant departure and variance from the applicable guideline range would best fulfill the goals of sentencing under *United States v. Booker*, 543 U.S. 220 (2005), the subsequent cases reaffirming its holding, and 18 U.S.C. §3553(a).

I.  **PERSONAL HISTORY OF KEONNA THOMAS**

Ms. Thomas's personal history is thoroughly addressed in the Presentence Investigation Report prepared by Officer Boyer, as well as in the report of the psychological evaluation conducted and prepared by Dr. Marc Sageman, M.D., Ph.D. (attached as Exhibit A).

Her family remains completely supportive of Ms. Thomas as is evidenced by the numerous heartfelt letters filed on her behalf. Their unwavering support will play a key role in helping Ms. Thomas move forward in a positive and law abiding manner. (attached as Exhibit B).

II. **APPLICATION OF THE STATUTORY FACTORS TO THIS CASE**

In the present case, the Court must consider the following factors when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing for Ms. Thomas:

   A.  **The nature and circumstances of Ms. Thomas's offense reveal a troubled soul seeking religious guidance.**

Ms. Thomas does not have a violent history; in fact she has always led a quiet, law abiding life. Her motivation and intent was not to cause harm, but rather to seek stability along with personal and religious acceptance. While obviously bright and educationally motivated, Ms. Thomas's emotional isolation left her susceptible to influence. Ms. Thomas turned to the internet when the local Muslim community failed to give her the kind of religious structure she desired. In seeking spiritual instruction, Ms. Thomas fell prey to the promises made by young ISIL

2

acolytes about a religious utopia in Raqqa, Syria. Indeed, this case boils down to Ms. Thomas's intention to travel to Syria and set up the life under "Sharia" that she had been promised.

Ms. Thomas has spent the last two years reflecting on her decisions. She carries significant guilt, finding it difficult to fathom how she could have ever considered abandoning her children. Ms. Thomas accepts responsibility for her behavior and recognizes that she allowed herself to lose perspective. In doing so, she knows that she put herself, her family, and society at large in danger.

> B.  A downward variance is necessary to avoid a gross sentencing disparity between Ms. Thomas and similarly-situated defendants.

The defense urges the Court to vary downward to a sentence between 30 and 54 months in order to avoid an unwarranted sentence disparity between Ms. Thomas and other women convicted of ISIL-related offenses.

Courts must avoid creating unwarranted sentence disparities among defendants who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). "This is so because the purpose of § 3553(a)(6) is to promote national uniformity in the sentences imposed by federal courts." *United States v. Begin*, 696 F.3d 405, 412 (3d Cir. 2012) (internal citations omitted). In this case, sentencing Ms. Thomas to the statutory-maximum term of 15 years' incarceration—as the applicable guidelines range demands—would result in a sentence unreasonably disparate from those imposed on similarly-situated defendants.

3

Ms. Thomas is among a handful of women who have been prosecuted (and sentenced) for ISIL-related crimes between March 1, 2014, and May 8, 2017. These sentences range from two to twelve years' incarceration, the median sentence being four years:

| Defendant | Personal Background | Statute(s) of Conviction | Circumstances of Conviction | Sentence Imposed |
|---|---|---|---|---|
| Shannon Maureen Conley | 19 at time of arrest, U.S. citizen, nurse's aide. | 18 U.S.C. § 371; 2339B (conspiracy to commit an offense against the U.S., namely, material support to ISIL) | Arrested at airport in route to Syria; desired to provide nursing assistance to ISIL fighters. | **Four** years' prison, three years' supervised release. |
| Jasminka Ramic | 42 at time of arrest, naturalized U.S. citizen, Bosnian immigrant. | 18 U.S.C. § 371; 2339B (conspiracy to commit an offense against the U.S., namely, material support to ISIL) | Helped raise money for ISIL and other so-called Islamic terrorist organizations. | **Three** years' prison, three years' supervised release. |
| Heather Elizabeth Coffman | 29 at time of arrest, U.S. citizen, mother. | 18 U.S.C. § 1001(a)(2) (false statement re: international terrorism) | Cultivated online, romantic relationships with ISIL fighters in Syria and recruited a foreign national to join ISIL. | **Four-and-one-half** years' prison, three years' supervised release. |
| Daniela Greene | 38 at time of arrest, naturalized U.S. citizen, ex-FBI agent w/top-secret security clearance. | 18 U.S.C. § 1001(a)(2) (false statement re: international terrorism) | Cultivated romantic relationship with a notorious and well-connected ISIS fighter. Traveled to Syria and married the operative before giving up. | **Two** years' prison, three years' supervised release. |
| Jaelyn Young | 19 at time of arrest, U.S. citizen, college student. | 18 U.S.C. § 2339B(a)(1) (material support to a designated terrorist organization) | Arrested at airport en route to Syria along with her boyfriend, both sought to join ISIL. | **Twelve** years' prison, 15 years' supervised release. |

Only two of the women listed above faced charges stemming from conduct similar to that underlying Ms. Thomas's conviction: Heather Elizabeth Coffman and

4

Daniela Greene. Their sentences must serve as the benchmark for Ms. Thomas's sentence.

Recall that Ms. Thomas pled guilty to attempting to provide herself as "personnel" to ISIL in violation of 18 U.S.C. § 2339B. The circumstances of her conviction are straightforward. Ms. Thomas is a native of North Philadelphia, and lived with her mother and two children in a rent-controlled home. She does not have a high school diploma, specialized training of any kind, or experience traveling domestically or internationally. Over the course of two years, her engagement with various Islamic websites and online religious fora led her to seek a faithful, Muslim husband, which she believed she had found in unindicted co-conspirator number two—a member of ISIL in Raqqa, Syria. Ms. Thomas's intention was to become his wife, and she hastily made arrangements to marry him, join ISIL, and live in Raqqa. Indeed, after countless hours absorbing ISIL propaganda, Ms. Thomas convinced herself that ISIL's so-called "caliphate" represented quintessential Islamic living and she wanted in. But Ms. Thomas never even made it to Philadelphia International Airport, and was instead arrested in her home on April 3, 2015, after having missed her initial flight to Spain.

Critically, Ms. Thomas's conduct bears no similarity to Jaelyn Young's, the woman who received the heftiest sentence of twelve years. Ms. Young was an aspiring medical student at Mississippi State University when she became infatuated with ISIL. She and her (also co-defendant) boyfriend, Muhammad Dakhlalla, arranged to travel to Syria and join ISIL. They had been in touch with

5

undercover federal agents posing as ISIL recruiters, purchased tickets to Istanbul, and were arrested at the airport. Ms. Young specifically sought to use her nascent medical background as a battlefield medic, whereas Mr. Dakhlalla desired to become a fighter. Notably, the government identified Ms. Young as the one who prodded Mr. Dakhlalla to abscond to Syria, a fact to which she readily admitted in a letter to her family.[1]

In contrast, Ms. Thomas's case more closely resembles the prosecutions of Ms. Coffman and Ms. Greene—the only other cases involving women whose ISIL-related convictions stemmed from online, social-media inspired romantic relationships with ISIL fighters. But even the circumstances of those cases are more serious than Ms. Thomas's unique situation.

Ms. Coffman admitted to using various Facebook accounts under different names to express support for ISIL propaganda and coordinate others' travel to Syria. In particular, Ms. Coffman admitted to having an online romantic relationship with a person nicknamed N.A., a foreign national who expressed interest in ISIL. Ms. Coffman and N.A. communicated non-stop for months, growing closer and more in love, and explored N.A.'s options for joining ISIL in Syria. According to a press release from the U.S. Attorney's Office for the Eastern

---

[1] *See generally* Emma Green, *How Two Mississippi College Students Fell in Love and Decided to Join a Terrorist Group*, THE ATLANTIC, May 1, 2017, *available at* https://www.theatlantic.com/politics/archive/2017/05/mississippi-young-dakhlalla/524751/.

6

District of Virginia,[2] Ms. Coffman "cultivated online relationships with individuals she believed were ISI[L] facilitators operating in Syria," and "put N.A. in contact with a facilitator to assist with his travel and eventual training with ISI[L]." Ms. Coffman even put up money for N.A.'s travel before their relationship—and scheme—deteriorated.

On November 13, 2014, the FBI interviewed Ms. Coffman about her contact with N.A. According to the aforementioned press release, Ms. Coffman erroneously told the agents that she "did not know whether N.A. had talked to anybody else who supported ISI[L], and that she did not know anybody N.A. had talked to"—even though Ms. Coffman had previously e-introduced N.A. to ISIL fighters. Three months later, on January 30, 2015, Ms. Coffman pled guilty to a single-count criminal information charging her with making a false statement relating to international terrorism. Although she faced a statutory-maximum penalty of eight years' incarceration (*see* 18 U.S.C. § 1001(a)), Ms. Coffman was sentenced to four-and-one-half years, followed by three years' supervised release.

Ms. Greene's story is even more intense.[3] Fluent in German, Ms. Greene began working for the FBI in 2011 as a linguist and was granted a coveted "top secret" national-security clearance. In January 2014, the Bureau assigned Ms.

---

[2] *Available at:* https://www.justice.gov/usao-edva/pr/glen-allen-woman-sentenced-4-years-prison-making-false-statements-international.

[3] *See generally* Scott Glover, *The FBI translator who went rogue and married an ISIS terrorist*, CNN INVESTIGATES, May 1, 2017, *available at* http://www.cnn.com/2017/05/01/politics/investigates-fbi-syria-greene/index.html.

7

Greene to its Detroit Field Office, where she was tasked with surveilling and monitoring an infamous ISIL fighter named Denis Cuspert. Formerly a German rapper nicknamed "Deso Dogg," Cuspert was known in Syria as Abu Talha al-Almani. He has appeared in numerous ISIL propaganda videos and was labeled a "Specially Designated Global Terrorist" by the State Department in January 2015.

After a few months of surveilling Cuspert, Ms. Greene—who was already married at the time—fell in love with Cuspert and warned that the FBI was after him. Shortly thereafter, she arranged to travel to Syria in order to marry Cuspert. This was far from trivial. In order to leave the United States, Ms. Greene was required to submit a "Report of Foreign Travel" form, which all FBI employees and contractors with national-security clearances must complete before traveling abroad. Although Ms. Greene claimed that she was going to visit her parents in Munich, Germany, she purchased a one-way ticket to Istanbul, and then crossed into Syria with the help of a third-party Cuspert had arranged. Once in Syria, Ms. Greene married Cuspert and spent weeks by his side. But Ms. Greene eventually experienced cold feet, and returned to the United States in August 2014. She was arrested shortly thereafter and, like Ms. Coffman, pled guilty to making a false statement in relation to international terrorism. Ms. Greene was sentenced to two years' incarceration and now lives in upstate New York.

To this day, the specifics of Ms. Greene's case remain murky. It is undisputed, however, that she selfishly abused a position of trust and power to marry a specially designated global terrorist—a label that is reserved for the worst

8

of the worst. While the confidential nature of the case makes it impossible to know the extent of Ms. Greene's relationship with Cuspert—and the extent to which she exploited her access to top-secret, national-security information—she put her entire country at risk by warning Cuspert that he was the target of an FBI investigation and by absconding to ISIL-controlled territory. In the words of the assistant U.S. attorney who prosecuted Ms. Greene, she "endangered our national security by exposing herself and her knowledge of sensitive matters to those terrorist organizations."[4]

Ms. Thomas's actions did not rise to the level of Daniela Greene's or Heather Elizabeth Coffman's. Unlike Ms. Coffman, Ms. Thomas did not maintain regular contact with a range of ISIL operatives, nor did she offer her own money and resources to help recruit ISIL fighters. And unlike Ms. Greene, Ms. Thomas was not a savvy FBI agent with a top-secret security clearance who divulged state-secrets to, and actually *married*, the very terrorist whom she was investigating. Instead, Ms. Thomas was a lonely, depressed, anxiety-ridden mother who spent too much time on the internet. And even though she technically violated the barebones terms of 18 U.S.C. § 2339B by attempting to relocate to ISIL-held territory and marry an ISIL fighter, she never gave ISIL anything of value—except her love.

By the time she is sentenced, Ms. Thomas will have spent almost 30 months in prison. Given the circumstances of her case and those of the few who are similarly situated, to impose a sentence anywhere near the applicable fifteen-year,

---

[4] *Supra*, n.3.

9

statutory-maximum penalty would create an intolerable disparity. Rather, a sentence somewhere between Ms. Greene's and Ms. Coffman's respective sentences (24 to 54 months' incarceration) is sufficient, but not more than necessary, to effectuate the factors set forth by 18 U.S.C. 3553(a), particularly (a)(6): "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Ms. Thomas has done all that is possible to show this Court that she is remorseful. Her history demonstrates that this was an aberration in her behavior and will not be repeated. At the same time, Thomas understands that the severity of the crime weighs heavily upon this Court. She also understands this Court's need to use this sentence as a general deterrence. Critically, the base offense level and severe guideline range certainly serve as a deterrent to others.

Ms. Thomas can certainly benefit from further education and vocational training. As reported in the PSI, she withdrew from high school because she felt that she did not "fit in" with other students, and experienced significant social anxiety. She is committed to furthering her education, and has availed herself of the classes available to her while she has been incarcerated at the Federal Detention Center. Ms. Thomas is also very motivated to learn a specialized skill or trade. Her goal of working in the medical office-support field is both realistic and attainable.

Ms. Thomas is committed to maintaining her physical and mental health. Her anxiety issues stem from a variety of past, traumatic experiences. Although Islam continues to provide a comfortable, nurturing structure for her, Ms. Thomas

10

will continue to explore other alternatives to addressing her emotional and mental health. In doing so, she has begun an intense journey of self-reflection, confronting head-on her tendency to unintentionally estrange herself from her family and society. To support her efforts, Ms. Thomas hopes to participate in the Eastern District of Pennsylvania Mental Health Court Protocol whenever she is released from prison. The government is in agreement that Ms. Thomas is an appropriate participant in the treatment court. United States Magistrate Judge Elizabeth T. Hey has approved her participation in the Protocol upon her release from custody and with the approval of the Court.

The United States Probation Department is adequately equipped to meet Ms. Thomas's rehabilitative needs. Ms. Thomas has demonstrated personal, emotional, educational and vocational growth while she has been incarcerated. She will certainly continue to avail herself of the resources provided while incarcerated; however, she looks forward to rebuilding her life with her children and family when she is released from custody and pursuing the positive direction that she has embraced.

## IV. CONCLUSION

Ms. Thomas readily admits her offense and its severity. But it must be reiterated that her crime is less severe than those similarly-situated cases that resulted in sentences of less than five years' incarceration. Ms. Thomas is not a threat to society. A true first-offender, she went astray and sought repose in a perversion of her faith. Given the circumstances of her offense, and the fact that she

11

has already started the rehabilitative process, a prolonged period of incarceration would be greater than necessary to effectuate the goals of sentencing. Instead, a downward variance to a sentence between 24 and 54 months is sufficient.

Respectfully submitted,

/s/ Elizabeth L. Toplin
ELIZABETH L. TOPLIN
Assistant Chief, Trial Unit

/s/ Kathleen Gaughan
KATHLEEN GAUGHAN
Assistant Federal Defender

## CERTIFICATE OF SERVICE

We, Elizabeth L. Toplin, Assistant Chief, Trial Unit, and Kathleen M. Gaughan, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that we have served a copy of the Defendant's Sentencing Memorandum, upon:

Jennifer A. Williams
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street, Suite 1250,
Philadelphia, Pennsylvania  19106

Christopher Boyer
United States Probation Officer
United States Probation Office
William J. Green Federal Building
600 Arch Street, Suite 2400
Philadelphia, PA 19106-1797

/s/ Elizabeth L. Toplin
ELIZABETH L. TOPLIN
Assistant Chief, Trial Unit

/s/ Kathleen Gaughan
KATHLEEN GAUGHAN
Assistant Federal Defender

DATE:       August 30, 2017

13